Jonathan R. MacBride (Bar No. 31851995)
Meredith C. Schilling (Bar No. 00802010)
**ZELLE LLP**
2929 Arch Street
Suite 1700, The Cira Centre
Philadelphia, PA 19104
Telephone: (484) 532-5341
Email: jmacbride@zellelaw.com
Additional Appearing Attorney Email Address:
mschilling@zellelaw.com

***Attorneys for Plaintiff,***
***Brian Fields***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Brian Fields,<br><br>Plaintiff,<br><br>v.<br><br>DSM-FIRMENICH AG, FIRMENICH INTERNATIONAL SA, FIRMENICH INC., AGILEX FLAVORS & FRAGRANCES, INC., GIVAUDAN SA, GIVAUDAN FRAGRANCES CORPORATION, CUSTOM ESSENCE LLC, SYMRISE AG, SYMRISE INC., SYMRISE US LLC, INTERNATIONAL FLAVORS & FRAGRANCES INC.,<br><br>Defendants. | Civil No. ____________<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED |

# TABLE OF CONTENTS


I. INTRODUCTION ....................1

II. PARTIES ....................3

A. First United States Purchaser ....................3

B. Defendants ....................4

C. Agents and Co-Conspirators ....................10

III. JURISDICTION AND VENUE ....................11

IV. BACKGROUND ....................12

A. Fragrance Ingredients and Fragrance Compounds ....................12

B. Regulatory Investigations ....................15

V. EVIDENCE OF CONSPIRACY ....................17

A. The Alleged Conspiracy Is Economically Plausible ....................17

B. Defendants Engaged in Parallel Conduct ....................17

C. Plus Factors ....................20

1. The Market is Highly Concentrated ....................20

2. Defendants Exchanged Competitively Sensitive Information ....................21

3. Pretextual Explanations for Parallel Conduct ....................21

4. High Barriers to Entry ....................21

5. Opportunities to Collude ....................22

6. Monitoring Mechanisms and Allocation Structures ....................26

7. Price Elevation ....................27

VI. INTERSTATE TRADE AND COMMERCE ....................27

VII. ANTITRUST INJURY AND CLASS ALLEGATIONS ....................28

A. Chain of Distribution and Pass-Through....28

B. Standing....30

C. Class Action Allegations....30

VIII. PLAINTIFF'S CLAIMS ARE TIMELY....33

IX. CLAIM FOR RELIEF....34

X. JURY DEMAND....36

## I. INTRODUCTION

1. Plaintiff brings this action pursuant to Section 4 of the Clayton Act on behalf of certain unrepresented U.S. victims of Defendants' conspiracy to unlawfully manipulate prices for Fragrance Ingredients and Fragrance Compounds (collectively, "Fragrances").

2. Defendants are the four largest producers of Fragrances, controlling nearly two-thirds of the global market. Fragrances produce distinctive scents. They are sold for incorporation into consumer goods such as perfumes, cosmetics, household cleaning products, and soaps ("Finished Fragrance Products"). This Complaint seeks damages for injuries suffered from January 1, 2018, through the period in which the effects of the conspiracy continued to harm Plaintiff and the class he seeks to represent, including up to the present ("Class Period").

3. As alleged more fully below, Defendants entered into an unlawful agreement in restraint of trade to increase the price of Fragrances. Defendants coordinated their pricing policies with one another, allocated certain customers to specific Defendants, and imposed supply constraints for Fragrances that elevated prices. The full scope of their collusive conduct remains to be discovered, but the

known facts confirm that Defendants conspired to increase profits at the expense of U.S. consumers.[1]

4. Plaintiff did not purchase directly from Defendants. Plaintiff, like the class he seeks to represent, purchased from a foreign entity that suffered its injuries outside the United States and therefore lacks standing to bring a Section 4 claim for damages. As alleged more fully below, foreign entities that incorporated the price-fixed Fragrances into their own Finished Fragrance Products "passed on" those overcharges to U.S. purchasers like Plaintiff in the form of higher prices. The Supreme Court has chosen to elevate the first purchasers with statutory standing to the preferred status of "private attorneys general" to enforce the antitrust laws. Here, because the foreign direct purchasers lack statutory standing, Plaintiff and the class he seeks to represent will play an important role in federal antitrust enforcement.

5. Plaintiff, and many members of the class he seeks to represent, reside in states that do not provide state-law avenues for relief. For them, this Complaint is their only path to compensation for overcharges they paid as a result of Defendants' antitrust violations and the only avenue available under U.S. law to strip Defendants of ill-gotten gains they realized as a result of conduct barred by U.S. antitrust law.

[1] The difference between prices set in a competitive market free of collusion and the prices charged as a result of collusion is the "overcharge."

6. The financial injuries that Plaintiff and the proposed class suffered arise from the direct, substantial, and reasonably foreseeable effects of Defendants' unlawful conspiracy on U.S. commerce. Plaintiff seeks damages to deter future antitrust violations, deprive Defendants of the fruits of their illegal actions, and provide compensation to the victims of antitrust violations.

## II. PARTIES

### A. First United States Purchaser

7. Plaintiff Brian Fields is an individual who resides in Kentucky. Fields purchased Dior Sauvage (a Finished Fragrance Product) directly from Sephora USA, Inc. ("Sephora"). Dior and Sephora are wholly owned subsidiaries of LVMH Moët Hennessy Louis Vuitton SA ("LVMH"). On information and belief, Dior manufactured Sauvage at its factory located in Saint-Jean-de-Braye, France,[2] using Fragrances that Dior purchased directly from one or more Defendants at an artificially inflated price. Dior incorporated the overcharges it paid into the price that it charged for Sauvage to Fields and similarly situated buyers. Dior sold Sauvage to Fields through Sephora. As French companies, LVMH, Dior, and Sephora all suffered their injuries in France, beyond the reach of federal law for

[2] *Dior Fragrances, Unique Know-how*, DIOR, https://www.dior.com/en_int/beauty/fragrance/dior-fragrances-unique-know-how.html (last visited Jan. 27, 2026).

purposes of seeking damages under Section 4.[3] Fields is the first U.S. purchaser of the price-fixed product. Fields suffered injuries as a result of the direct, substantial, and reasonably foreseeable effects of Defendants' conduct on domestic commerce.

### B. Defendants

8. **DSM:** Defendant DSM-Firmenich AG ("DSM AG") is a Swiss corporation with its principal place of business in Kaiseraugst, Switzerland that manufactures and sells Fragrances. DSM was created by the merger of DSM Group and Firmenich International SA in 2023. Prior to the merger, DSM AG was a public limited liability company, headquartered in Heerlen, the Netherlands. DSM is headquartered in Switzerland and listed on the Euronext Amsterdam stock exchange under the ticker symbol DSFIR. DSM AG has operations throughout the United States, either directly or through its wholly owned and controlled subsidiaries and affiliates. During the Class Period, DSM AG manufactured and/or sold Fragrances through its wholly owned subsidiaries internationally, including in the United States.

9. Defendant Firmenich International SA ("Firmenich Int'l") is a Swiss corporation with its principal place of business in Satigny, Switzerland. It specializes in the production and supply of fragrances, flavors, aroma chemicals, pine resin, pine turpentine oil, pine terpene, and systems. As of 2022, Firmenich

---

[3] To the extent that LVMH "sold" the fragrance to its U.S. subsidiary, that internal transfer would not give the U.S. subsidiary standing under Section 4 because the LVMH entities are deemed a single entity under U.S. antitrust law.

controlled roughly 11% of the global market for Fragrances. During the Class Period, Firmenich Int'l manufactured and/or sold Fragrances internationally, including in the United States. Defendant Firmenich SA was, until May 2023, a privately owned Swiss corporation and self-proclaimed largest privately owned fragrance company. Firmenich SA ceased to exist as an independent entity following the DSM/Firmenich merger in May of 2023.[4]

10. Defendant Firmenich Inc. is a U.S. subsidiary of DSM AG incorporated under the laws of Delaware. Firmenich Inc. maintains its principal place of business at 250 Plainsboro Road, Plainsboro, New Jersey 08536. During the Class Period, Firmenich Inc. manufactured and/or sold Fragrance Products to purchasers both inside and outside the United States, directly or through predecessors, affiliates, or subsidiaries. During the Class Period, DSM AG controlled Firmenich Inc. both generally and with respect to the conduct of Firmenich Inc. in furtherance of the unlawful acts alleged in this Complaint.

11. Defendant Agilex Flavors & Fragrances, Inc. ("Agilex") is a U.S. subsidiary of DSM AG incorporated under the laws of Delaware. Agilex maintains its principal place of business at 140 Centennial Avenue, Piscataway, New Jersey 08854. During the Class Period, Agilex manufactured and/or sold Fragrance

---

[4] This Complaint uses the term "DSM" to collectively refer to DSM AG and the wholly owned subsidiaries affiliates described above.

Products to purchasers both inside and outside the United States, directly or through predecessors, affiliates, or subsidiaries. Firmenich International SA announced that it had completed the acquisition of Agilex on July 11, 2017. Since the acquisition, DSM AG has controlled Agilex both generally and with respect to the conduct of Agilex in furtherance of the unlawful acts alleged in this Complaint. DSM AG, Firmenich International SA, Firmenich Inc., and Agilex are collectively referred to as "DSM."

12. **Givaudan:** Defendant Givaudan SA is a Swiss corporation with a principal place of business in Vernier, Switzerland. Givaudan SA is listed on the SIX Swiss Exchange ("GIVN"). Givaudan is one of the largest manufacturers of Fragrances in the world with operations in the United States and internationally. As of 2022, Givaudan SA controlled roughly 18% of the global market for Fragrances. Prior to 2000, Givaudan SA was owned and operated by F-Hoffmann-La Roche and overseen by Kuno Sommer, who pleaded guilty in 1999 to a criminal charge of making false statements to U.S. federal investigators about his role in the vitamins price-fixing conspiracy. Givaudan SA is now owned and operated by Gilles Andrier (CEO) and Calvin Frieder (Chairman of the Board of Directors).

13. Defendant Givaudan Fragrances Corporation is a U.S. subsidiary of Givaudan SA incorporated under the laws of Delaware. Givaudan Fragrances Corporation maintains its principal place of business at 717 Ridgedale Avenue, East

Hanover, New Jersey 07936. During the Class Period, Givaudan Fragrances Corporation manufactured and/or sold Fragrance Products to purchasers both inside and outside the United States directly or through predecessors, affiliates, or subsidiaries. Givaudan SA controls Givaudan Fragrances Corporation both generally and with respect to the conduct of Givaudan Fragrances Corporation in furtherance of the unlawful acts alleged in this Complaint.

14. Defendant Custom Essence LLC ("Custom Essence") is a New Jersey corporation with its principal place of business located at 53 Veronica Ave., Somerset, New Jersey 08873. Prior to late 2021, Custom Essence was registered and conducted business as Custom Essence Incorporated. Custom Essence specializes in the formulation of natural fragrance and creates perfumes for customers. Givaudan SA acquired Custom Essence in 2021, and since then has operated it as a wholly owned subsidiary. Since the acquisition, Givaudan SA has controlled Custom Essence both generally and with respect to the conduct of Custom Essence in furtherance of the unlawful acts alleged in this Complaint. Givaudan SA, Givaudan Fragrances Corporation, Custom Essence are collectively referred to as "Givaudan."

15. **Symrise**: Defendant Symrise AG is a German company with a principal place of business in Holzminden, Germany. Symrise AG is a global supplier of flavors, fragrances, cosmetics actives and functional ingredients. Symrise AG was

formed by the 2003 merger of Haarann & Reimer and Dragoco. Symrise's core businesses are flavors and fragrances. The company supplies fragrance oils, fine-fragrance formulations, flavor systems for food and beverage, aroma molecules and natural extracts. As of 2022, Symrise controlled roughly 12% of the global Fragrances market. Symrise reports multi-billion dollar euro sales and is a top producer of fragrance raw materials.

16. Defendant Symrise Inc. is a U.S. subsidiary of Symrise AG incorporated under the laws of New Jersey. Symrise Inc. maintains its principal place of business at 300 North Street, Teterboro, New Jersey 07608. During the Class Period, Symrise Inc. manufactured and/or sold Fragrance Products to purchasers in the United States, directly or through predecessors, affiliates, or subsidiaries. Symrise AG controls Symrise Inc. both generally and with respect to the conduct of Symrise Inc. in furtherance of the unlawful acts alleged in this Complaint.

17. Defendant Symrise US LLC is a subsidiary of Symrise AG, and is headquartered in Teterboro New Jersey, with offices located at 300 North Street, Teterboro, New Jersey 07608. Symrise US LLC is a limited liability company organized and existing under the laws of the State of Delaware. Symrise US LLC transacts or has transacted business in this District, and is engaged in the development, manufacture, and sale of flavors and fragrances. Symrise AG controls Symrise US LLC both generally and with respect to the conduct of Symrise US LLC

in furtherance of the unlawful acts alleged in this Complaint. Symrise AG, Symrise Inc., and Symrise US LLC are collectively referred to as "Symrise."

18. **International Flavors & Fragrances:** Defendant International Flavors & Fragrances Inc. ("IFF") is a New York corporation with its principal place of business in New York. As of 2022, IFF controlled roughly 22% of the global Fragrance Chemical market. IFF is the self-proclaimed "leading creator and manufacturer of scent and pharma solutions and complementary adjacent products, including cosmetic active and natural health ingredients, which are used in a wide variety of consumer products."[5] IFF promotes itself as one of the leading suppliers of Fragrances for the world's finest companies known for creating "fragrance compounds, fragrance ingredients, and cosmetic ingredients that are integral elements in the world's finest perfumes and best-known household and personal care products."[6] IFF has approximately 210 manufacturing facilities, creative centers and application laboratories in 45 countries, including their principal research and development centers located in New Jersey.[7]

---

[5] International Flavors & Fragrances Inc., 2021 Annual Report (Form 10-K), at 1 (Feb. 28, 2022).

[6] *Id.* at 3 ("Our consumer fragrances include three end-use categories of products: Fabric care, including laundry detergents, fabric softeners and specialty laundry products; Home Care, including household cleaners, dishwashing detergents and air fresheners; and Body Care, including personal wash, hair care and toiletries products.").

[7] *Id.* at 6.

19. During the Class Period, each of the Defendants sold Fragrances in this District and throughout the United States.

20. Each Defendant participated in the conspiracy to artificially inflate the price of Fragrances and committed overt acts in furtherance of the alleged conspiracy in this District and the United States.

**C. Agents and Co-Conspirators**

21. The term "Defendants" as used in this Complaint refers to and encompasses each Defendant and its successors, parent companies, subsidiaries, affiliates, employees, agents, officers, and directors.

22. The acts alleged against Defendants in this Complaint were authorized, ordered, or done by their officers, agents, employees, or representatives, while actively engaged in the management and operation of Defendants' businesses or affairs.

23. Various persons and/or firms not named as Defendants in this Complaint participated as co-conspirators in the alleged conduct, including certain domestic subsidiaries/affiliates of Defendants. Those subsidiaries/affiliates include, but are not limited to Givaudan Fragrances Corporation, Ungerer & Company, Inc., Custom Essence LLC, Belle Aire Creations, Firmenich Inc., Agilex Flavors & Fragrances, Inc., Fragrance West, Inc., Natural Flavors Inc., DRT, America Symrise Inc., and Symrise US LLC, Renessenz LLC, Belmay, Manheimer Fragrances, Bush

Boake Allen, Inc., van Ameringen-Haebler, Inc., Frutarom USA Inc. Each of the entities within a corporate family carried out the business of manufacturing, distributing, marketing, and/or selling Fragrances in coordination with their parents, subsidiaries, affiliates, and related entities.

## III. JURISDICTION AND VENUE

24. Plaintiff brings this action on behalf of himself and the First U.S. Purchaser Class (defined below) under Sections 1 and 3 of the Sherman Act (15 U.S.C. §§ 1, 3) to recover damages suffered by Plaintiff and the First U.S. Purchaser Class, costs of suit, including reasonable attorneys' fees, and for such other relief permitted under U.S. antitrust law.

25. This Court has subject-matter jurisdiction over this action pursuant to 15 U.S.C. § 26, and 28 U.S.C. §§ 1331, 1332, and 1337.

26. Venue is proper in this District pursuant to Sections 4 and 12 of the Clayton Act (28 U.S.C. §§ 15, 22, and 26), and pursuant to 28 U.S.C. § 1391(b), (c), and (d), because one or more Defendants resided, transacted business, was found, or had agents in this District. Defendants' alleged conduct exerted a direct, substantial, and reasonably foreseeable effect on interstate commerce in the United States, including in this District.

27. This Court has personal jurisdiction over Defendants because, *inter alia*: a portion of the alleged conduct took place in this District; Defendants engaged

in anticompetitive conduct that was directed at and had the foreseeable and intended effect of causing injury to residents and businesses residing or located in this District; Defendants routinely conduct business in this District and availed themselves of the markets in this District through promotion and marketing; and Defendants' conduct falls within Fifth Amendment standards of Due Process applicable to federal statutes authorizing personal jurisdiction in federal court because Section 12 of the Clayton Act implicates important federal policy considerations.

## IV. BACKGROUND

### A. Fragrance Ingredients and Fragrance Compounds

28. Consumer products such as fine perfume and cosmetics derive their scent or aroma from Fragrances. All Fragrances originate from a variety of raw materials, which may be either natural or synthetic. Defendants use these raw materials to create Fragrance Ingredients and then blend multiple Fragrance Ingredients to create Fragrance Compounds.[8]

29. Defendants source natural Fragrance Ingredients from plants and animals, such as essential oils, sometimes followed by chemical modification and organic synthesis or direct synthesis from petrochemicals. Examples of common

---

[8] *Synthetic Ingredients*, DSM - FIRMENICH, https://www.dsm-firmenich.com/en/businesses/perfumery-beauty/ingredients/synthetics.html (last visited Jan. 27, 2026).

natural Fragrance Ingredients include rose petals, jasmine, sandalwood, vanilla, and citron. Synthetic Fragrance Ingredients trace their origin to petrochemicals such as phthalates, synthetic musks, parabens, and benzene derivatives.[9] About three-quarters of Fragrance Ingredients come from modern synthesis plants around the world, while the remaining share is sourced from natural ingredients.

30. Defendants use Fragrances captively in their own production and sell Fragrances to third parties. In addition, Defendants often sell Fragrances to each other.[10] The European Commission ("EC") has noted a "level of interdependence and solidarity" among Defendants that is "particularly high."[11] As a result, each Defendant is "interdependent with the others to the point of there being a risk of price discrimination as regards the cross-supplied ingredients."[12] The EC wrote: "In

[9] *Synthetic Fragrances*, UPFRONT COSMETICS (May 14, 2020), https://upfrontcosmetics.ca/blogs/be-upfront/synthetic-fragrances (last visited Jan. 27, 2026).

[10] *See, e.g.,* International Flavors & Fragrances Inc., *supra* note 5, at 5 ("Fragrance ingredients are natural and synthetic, and active and functional ingredients that are used internally and sold to third parties, including competitors, for use in the preparation of compounds.")

[11] European Commission Judgment of the General Court (First Chamber), Case No. T-263/63 (April 30, 2025) ("EC April Judgment") ¶ 66, *available at* https://eur-lex.europa.eu/legal-content/en/TXT/?uri=CELEX:62023TJ0263.

[12] *Id.*

such a market environment, if a company significantly lowers prices in an attempt to capture its competitors' sales, the latter may threaten not to sell it ingredients."[13]

31. The chain of distribution (or "value chain" as Symrise describes it) for Fragrances is summarized below.




32. There is a high degree of supply-side substitutability for Fragrances. Any Defendant can, and does, produce any Fragrance irrespective of its end-use. Defendants can switch production relatively easily from one Fragrance to another.[14] Even though various fragrance compositions are often developed individually by

---

[13] *Id.* ¶ 67.

[14] Commission of European Communications, Case No COMP/M.4507 Givaudan/Quest International Notification of 17 January 2007 pursuant to Article 4 of Council Regulation No 139/2004, *available at* https://ec.europa.eu/competition/mergers/cases/decisions/m4507_20070221_20310_en.pdf.

manufacturers in close cooperation with their customers, buyers can typically get the same, or a very similar, product from a different supplier.[15]

33. Fragrances are interchangeable commodity products. Their components are no mystery.[16] The compositions of Fragrances were considered secrets decades ago, but that is no longer true. Technological developments in gas chromatography and mass spectrometry provide Defendants with the ways and means to reverse engineer a competitor's product. Every Defendant can reverse-engineer its competitors' products. There is no meaningful difference between a Fragrance produced by one Defendant as compared to another. Absent collusion, Defendants would have competed on price even for so-called proprietary blends.

**B. Regulatory Investigations**

34. On March 7, 2023, the EC carried out unannounced inspections at the premises of unidentified companies and an association active in the manufacturing and sale of Fragrances that were suspected of engaging in anticompetitive business practices. The U.S. Department of Justice Antitrust Division is investigating as well.

---

[15] *Id.*

[16] Symrise, Corporate Report 2022, https://symrise.com/corporatereport/2022/downloads/SYM_corporatereport_2022_EN.pdf (last visited Jan. 23, 2026). This value chain includes Symrise's Taste, Nutrition, and Health Segment along with its Scent & Care Segment.

35. The EC had "information indicating that a number of Fragrance Chemical manufacturers have entered into agreements or engaged in concerted practices to exchange sensitive business information and coordinate their business behaviour and commercial strategy regarding the supply of consumer fragrances and fragrance ingredients to customers and competitors."[17]

36. During its investigation, the EC found that a senior employee of IFF intentionally deleted WhatsApp messages exchanged with a competitor containing business-related information.[18] The deletion took place after the employee had been informed about the EC's inspection.[19] The EC ultimately fined IFF €15.9 million for obstructing its investigation.[20]

37. The Government investigations targeted DSM, Givaudan, Symrise, and IFF.[21] Until the announcement of those inspections, Plaintiff was unaware of Defendants' collusive conduct.

---

[17] EC April Judgment ¶ 3.

[18] *Commission fines International Flavors & Fragrances €15.9 million for deleting WhatsApp messages during an antitrust inspection*, EUROPEAN COMMISSION (June 24, 2024), https://ec.europa.eu/commission/presscorner/detail/en/ip_24_3435 (last visited Jan. 27, 2026).

[19] *Id.*

[20] *Id.*

[21] *See, e.g.,* Ludwig Burger & John Stonestreet, *Givaudan, Symrise, DSM shares drop on global fragrance cartel probe*, REUTERS (Mar. 28, 2023), https://www.reuters.com/markets/europe/swiss-antitrust-agency-names-4-firms-fragrances-cartel-probe-2023-03-08/ (last visited Jan. 27, 2026).

## V. EVIDENCE OF CONSPIRACY

### A. The Alleged Conspiracy Is Economically Plausible

38. Defendants had obvious economic motives to conspire. Defendants were able to achieve through collusion — higher prices — what they could not have achieved had they acted independently. It was against Defendants' independent self-interest to implement, and adhere to, announced price increases (particularly in times of stable supply costs) because, in the absence of collusion, Defendants would have competed to gain market share.

### B. Defendants Engaged in Parallel Conduct

39. The EC has noted the existence of evidence that Defendants "adopt similar behaviour, in particular concerning pricing and contractual practices."[22] The EC noted that Defendants "exchanged sensitive information, such as information concerning contract cycles . . . which ought to be confidential."[23]

40. In addition, the EC noted evidence showing that one of the Defendants had knowledge of confidential information relating to contract cycles and that, in the

[22] EC April Judgment ¶ 69.

[23] *Id.* ¶ 70.

context of a call for "tenders,"[24] the applicant made contractual offers which were "disturbingly similar to those of its competitors."[25]

41. Publicly available information discloses the following parallel price increases:

a. Beginning in January 2018, Givaudan announced a 6% price increase effective the following month. Givaudan's first-quarter sales report stated that the company "continue[d] to implement price increases in collaboration with its customers to compensate for the increase in input costs." Symrise made a substantially similar statement during its first-quarter earnings call.

b. In an August 7, 2018, SEC filing, IFF disclosed a 9% net sales increase due in part to price increases. Symrise announced another price increase on August 14, 2018. IFF's then-CEO announced on September 6, 2018, that IFF's teams were increasing prices "as much as they can." On October 8, 2018, Givaudan confirmed that it too was continuing to increase prices "to compensate for increase in input costs." On a January 25, 2018, investor call, Givaudan announced that the company was "working on price increases."

c. On February 19, 2019, IFF's Vice President of Global Communications and Investor Relations announced that IFF was looking to achieve "about a 4% increase related to the scent" business. On July 18, 2019, Givaudan's CEO indicated that Givaudan was able to recoup all the increases in costs of its raw materials through price increases.

d. On August 10, 2019, Symrise's Chief Financial Officer reported that Symrise was "successful in getting through" price increases in the fragrance segment. During a September 2019 conference, IFF's CEO announced multiple quarters of "midsingle-digit growth" in the

---

[24] The term "tender" refers to the standard business and procurement process where a company formally invites Defendants to submit competitive bids for a contract to supply specific goods or services.

[25] EC April Judgment ¶ 82.

fragrance business attributable half to sales volume and half to price growth. One of Symrise's executives commented on strong profitability metrics in the fourth quarter of 2019 "mainly due to under-proportional raw material price increases and good cost management" while another allegedly remarked regarding raw material costs "most of this levels out ... a lot of these effects level themselves out."

e. In July 2020, Givaudan's CEO announced that its improved profit margin was not related to a change in raw material costs, but instead was attributable to price increases which allowed the company's fragrance division to grow 4.5% like-for-like despite the Covid-19 pandemic occurring in the intervening months." On August 11, 2020, Firmenich's CEO reported a 6% revenue increase attributable to the company's "successful pricing" and the "favourable impact of raw material costs."

f. In November 2021, IFF executives acknowledged "increasing prices to combat inflationary pressures" and "broad-based pricing actions across all of our businesses." Firmenich's CEO announced that in the second half of 2021 Firmenich's "revenue grew by 12% "and adjusted EBITDA increased "by 25%," which Plaintiffs attribute to price increases. Symrise's CEO confirmed in 2022 that it had increased prices during the second half of 2021.

g. In March of 2022, IFF announced more price increases. Givaudan followed suit with a similar announcement a month later. On a May 2022 earnings call, IFF acknowledged a roughly 8% price increase during the first quarter of 2022 and noted that they were "not unique" and that "all of our competitors are out there basically taking prices up as well." IFF's then-CEO confirmed that "IFF's price increases were 'neck to neck' with IFF's competitors 'in the market'" and, on the same call, he also stated "we actually expect - and what we've seen from an awful lot of our competitors is everybody is basically implementing the same range of pricing in the market."

h. On July 21, 2022, Givaudan announced another price increase, despite rising sales in the preceding quarter. On August 2, 2022, Symrise announced company-wide price increases. Firmenich followed suit on August 5, 2022, announcing that they would continue increasing

prices and acknowledging that 30% of the company's FY2022 growth was attributable to pricing.

i. On November 8, 2022, IFF's CFO also acknowledged continued price increases. In January 2023, Givaudan's CFO told investors that price increases had partially compensated for higher fragrance input costs in the preceding months. On February 9, 2023, IFF CFO Glenn Richter indicated that there had been price increases in the company's scent division, and one week later, Firmenich announced that its continued growth was attributable in part to "strong pricing measures" and that "further pricing actions" would be taken going forward

j. In March 2023, Symrise's CFO reported that its 11.4% sales growth in 2022 was attributable "around 75% [to] pricing and around 25% volume growth in organic."

## C. Plus Factors

42. "Plus factors are economic actions and outcomes, above and beyond parallel conduct by oligopolistic firms, which are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action."[26]

1. The Market is Highly Concentrated

43. Defendants are the four largest players in the global Fragrances market. They collectively controlled more than 2/3 of the global market during the Class Period. Defendants have consistently increased their share of the market through acquisitions of smaller rivals. The remaining smaller players lack the resources and capacity to materially constrain the effects of Defendants' collusion. Defendants are

[26] William E. Kovacic, Robert C. Marshall, Leslie M. Marx, Halbert L White, *Plus Factors and Agreement in Antitrust Law*, 110 Mich. L. Rev. 393, 393 (2011), https://repository.law.umich.edu/mlr/vol110/iss3/1.

also vertically integrated into the raw materials that they use to produce Fragrance Ingredients and in their ability to combine those into Fragrance Compounds for sale.

2. Defendants Exchanged Competitively Sensitive Information

44. As alleged above, Defendants exchanged sensitive business information, including information regarding prices, contract cycles, and bidding structures. Such exchanges of information are routinely viewed by economists as evidence of a price-fixing conspiracy.[27]

3. Pretextual Explanations for Parallel Conduct

45. Defendants' pattern of price increases is not adequately explained by market factors like increased input costs. Sales and profit measures increased during the Class Period and Defendants passed on a significant amount of increased materials costs to consumers without suffering a competitive disadvantage as a result. On information and belief, Defendants' purported reasons for price increases were false and pretextual.

4. High Barriers to Entry

46. Defendants' control over the Fragrances industry is protected by high barriers to entry for would-be competitors: new entrants would need to learn to

[27] *See, e.g.*, Christopher Leslie, *How to Hide a Price-Fixing Conspiracy: Denial, Deception, and Destruction of Evidence*, 2021 U. Ill. L. Rev. 1199, 1208 (2021), https://illinoislawreview.org/print/vol-2021-no-4/how-to-hide-a-price-fixing-conspiracy/.

navigate a robust regulatory landscape and gain access to raw materials (some of which are already largely controlled by the Defendants), which would be made more difficult by the high volume of capital required for adequate research, development, and marketing in a concentrated industry, particularly before obtaining economies of scale. IFF, Givaudan, and Symrise have all acknowledged high entry barriers in public statements.[28] The economics literature recognizes that markets are more susceptible to collusion where there are barriers to entry.[29]

5. Opportunities to Collude

47. "Communication is a central part of the operation of a cartel."[30] Defendants belonged to, and participated in the activities of, several trade associations. These activities provided a forum for Defendants to form and

[28] Givaudan, for example, listed the industry's "high barrier to entry (complexity, R&D, consumer insight, regulations, etc.)" in a 2022 investor presentation. Givaudan, *Investor Presentation*, (Jan. 2022), https://www.givaudan.com/files/giv-2022-investor-presentation_jan.pdf (last visited Jan. 27, 2026). Symrise similarly identified for investors in 2019 high barriers to entry, included "core list system and increasing regulatory pressure." Symrise, *Investor Presentation*, (Oct. 2019), https://www.coursehero.com/file/251297074/190923-Symrise-IR-presentation-after-H1pdf/ (last visited Jan. 27, 2026).

[29] *See, e.g.*, Massimo Motta, *Competition Policy Theory and Practice* (New York Cambridge University Press, 2004), at 143–44.

[30] *Plus Factors*, *supra* note 26.

implement their unlawful agreements.[31] One of those organizations and one of the main facilitators of communication between the defendants was the International Fragrance Association ("IFRA").

48. IFRA is a self-regulatory body headquartered in Geneva, Switzerland.[32] The IFRA is the official self-regulatory body of the fragrance industry worldwide. The IFRA publishes standards including ingredients that are prohibited, restricted, or only allowed in specific quantities. The purpose of the IFRA is to ensure the safety of fragrance materials. The IFRA also works closely with the International Organization of Flavor Industry (IOFA), where all Defendants were also a part of this organization as well.

49. The EC did not just target Defendants in its raids, it also targeted IFRA.[33] The EC conducted unannounced inspections at an unnamed industry association. The EC had concerns that the association may have colluded with

---

[31] The economics literature emphasizes the role of communication in cartels and, in particular, the central role that trade associations can play in the functioning of effective cartels. *See, e.g.,* Joseph E. Harrington Jr., *"How do cartels operate?"* Foundations and Trends in Microeconomics 2, no. 1 (2006): 1–105*; Robert C. Marshall and Leslie M. Marx, Economics of Collusion: Cartels and Bidding Rings*, (Cambridge, Massachusetts: The MIT Press, 2012), at 133–35; *Spotlight on Trade Associations*, FEDERAL TRADE COMMISSION, https://www.ftc.gov/advice-guidance/competition-guidance/guide-antitrust-laws/dealings-competitors/spotlight-trade-associations (last visited Jan. 27, 2026).

[32] EC April Judgment ¶¶ 4, 31-32, 35.

[33] *Id.*

Defendants in violation of competition law. The EC has stated that "some" of the suspected anticompetitive behavior "might have been facilitated by" IFRA.[34]

50. IFRA consisted of seven members during the Class Period, four of which were Defendants.[35] Defendants were all represented on IFRA's Board of Directors. Every year, IFRA conducted a multi-day Global Fragrance Summit where Defendants meet in person. IFRA stages other events throughout the year for its members to meet in person. IFRA was chaired by a Symrise executive, and Defendants' employees routinely attended events hosted by IFRA.

51. In rejecting a challenge by Symrise to the inspection of its premises, the EC confirmed that the suspicions of collusive activity included "the exchange of sensitive business information, the coordination of commercial [behaviour] and commercial strategies, directly [or] through IFRA, regarding the supply of consumer fragrances and fragrance ingredients to customers and competitors as well as the potential coordination, together with or with the support of IFRA, of the setting of IFRA standards with the intention to exclude other suppliers of fragrance [or] fragrance ingredients from the market."[36] The EC elaborated that it suspected that

---

[34] *Id.* ¶ 4.

[35] *Id.* ¶ 35. The others are Robertet Groupe, Takasago International Corporation, and BASF. *See IFRA members*, IFRA, https://ifrafragrance.org/about-ifra/membership (last visited Jan. 23, 2026).

[36] EC April Judgment ¶¶ 3, 32.

Fragrances manufacturers (a) entered into agreements or engaged in concerted practices to exchange sensitive business information, (b) to coordinate their business behavior and commercial strategy regarding the supply of consumer Fragrances to customers and competitors and, (3) "as part of this" conduct, coordinate their pricing mechanisms and strategy as well as other commercial conditions. The EC noted a concern that Fragrances manufacturers also have allocated the Fragrances market among themselves and coordinated their strategy regarding tenders.[37] Based on information available to the EC at the time, the coordination in part took place during or at the occasion of IFRA meetings.[38] Further, the EC wrote that it had reason to believe Fragrances manufacturers, together with IFRA or with the support of IFRA, coordinated the setting of IFRA standards with the intention to exclude other Fragrance Chemical suppliers.[39]

52. Defendants were also represented in the North America-focused Fragrance Creators Association ("FCA"), before jointly deciding (as announced in May 2020) to leave to form their own Association, the Fragrance Science &

---

[37] *Id.* ¶ 32.

[38] *Id.*

[39] *Id.* ¶¶ 31-32.

Advisory Council ("FSAC") in March 2021.[40] Defendants were the only members of FSAC at its founding. Defendants were also all represented in the Research Institute for Fragrance Materials ("RIFM") which, alongside IFRA, controls safety standard-setting and enforcement in the industry.

6. Monitoring Mechanisms and Allocation Structures

53. Defendants monitored their price-fixing arrangement through public statements (including those mentioned above) and by exchanging competitively sensitive information by engaging in inter-defendant sales.

54. Defendants were also positioned to monitor their agreements through IFRA communications and meetings.

55. Defendants' sales of raw materials and Fragrances to each other provided a structure for Defendants to allocate collusive gains among themselves and redistribute gains and losses among themselves to maintain compliance with the alleged agreements. Such inter-competitor sales are often a component of price-fixing cartels like the one alleged in this Complaint.[41]

---

[40] Hannah Fink, *Firmenich, Givaudan, IFF, Symrise Launch Fragrance Council*, PERFUMERFLAVORIST.COM (Mar. 16, 2021), https://www.perfumerflavorist.com/fragrance/ingredients/news/21868162/symrise-9280-firmenich-givaudan-iff-symrise-launch-fragrance-council (last visited Jan. 27, 2026).

[41] *See, e.g.*, Christopher Leslie, *Balancing the Conspiracy's Books: Inter-Competitor Sales and Price-Fixing Cartels*, 96 Wash. U. L. Rev. 1 (2018); *The Economics of Collusion*, *supra* note 31, at § 11.4.

7. Price Elevation

56. Bureau of Labor Statistics ("BLS") data reflect steadily declining prices for Fragrances from mid-2015 through early 2018, a change to relatively flat prices starting in 2022, and significantly increased prices that remain elevated through the most recent publication of BLS data. These raw data are indicative of price elevation subject to more robust econometric study. Price elevation is a standard hallmark of effective price-fixing conspiracies.[42]

## VI. INTERSTATE TRADE AND COMMERCE

57. Billions of dollars of transactions in Fragrances are entered into each year in interstate commerce in the United States and its territories and the payments for those transactions flowed in interstate commerce.

58. Defendants' manipulations of the market had a direct, substantial, and foreseeable impact on interstate commerce in the United States and its territories.

59. Defendants intentionally targeted their unlawful conduct to affect commerce, including interstate commerce within the United States and its territories, by combining, conspiring, and/or agreeing to fix, maintain, stabilize, and/or artificially inflate prices.

60. Defendants' unlawful conduct has a direct impact on competition in the United States and its territories. Absent Defendants' combination, conspiracy,

---

[42] *Plus Factors*, *supra* note 26.

and/or agreement to manipulate the market for the sale of fragrances and fragrance ingredients, the prices of fragrances and fragrance ingredients would have been determined by a competitive, efficient market.

## VII. ANTITRUST INJURY AND CLASS ALLEGATIONS

### A. Chain of Distribution and Pass-Through

61. As shown, Defendants manufactured and sold Fragrances to manufacturers who then incorporated those Fragrances into their own products (Finished Fragrance Products). For example, Defendants sell Fragrances to perfume manufacturers. Those perfume manufacturers, in turn, sell Finished Fragrance Products to distributors, resellers, and consumers.

62. It is well established in economic theory that direct purchasers of price-fixed products pass the overcharges that they paid to cartel members on to their own customers through higher prices. Plaintiff and the putative class paid those overcharges. Section 4 provides that "any person" injured by reason of a Sherman Act violation may bring a claim for damages. Plaintiff and the proposed class are such persons. The foreign direct purchasers from whom they purchased are not.

63. Defendants' cartel exerted a direct, substantial, and reasonably foreseeable effect on U.S. commerce. Defendants understood that their overcharges would be passed down the chain of distribution through higher prices for Finished Fragrance Products. Defendants also targeted the U.S. through direct sales to U.S.

victims. Standard economic theory predicts that in perfectly competitive markets, the pass-through rate is 100% (or more). Here, sellers of Finished Fragrance Products competed aggressively to sell their products which implies a substantial pass-through rate, the amount of which will be determined through economic and/or statistical analysis.

64. Two antitrust scholars—Professors Robert G. Harris (Professor Emeritus and former Chair of the Business and Public Policy Group at the Haas School of Business at the University of California at Berkeley) and the late Lawrence A. Sullivan (Professor of Law Emeritus at Southwestern Law School and author of the Handbook of the Law of Antitrust)—have observed that "in a multiple level chain of distribution, passing on monopoly overcharges is not the exception: it is the rule."[43] As Professor Jeffrey K. MacKie-Mason (Arthur W. Burks Professor for Information and Computer Science and Professor of Economics and Public Policy at the University of Michigan), an expert who presented evidence in a number of indirect purchaser cases involving Microsoft Corporation, said (in a passage quoted in the judicial decision in that case granting class certification):

> As is well known in economic theory and practice, at least some of the overcharge will be passed on by distributors to end consumers. When the distribution markets are highly

[43] Robert G. Harris & Lawrence A. Sullivan, *Passing on the Monopoly Overcharge: A Comprehensive Policy Analysis*, 128 U. Pa. L. Rev. 268, 275 (1979).

> competitive, as they are here, all or nearly the entire overcharge will be passed on through to ultimate consumers . . . . Both of Microsoft's experts also agree upon the economic phenomenon of cost pass through, and how it works in competitive markets. This general phenomenon of cost pass through is well established in antitrust laws and economics as well.

**B. Standing**

65. The Complaint seeks redress only for Plaintiff and those similarly situated victims who paid artificially elevated prices for Finished Fragrance Products to foreign sellers who were, themselves, victims of the conspiracy but lack statutory standing to bring claims under Section 4 of the Clayton Act.

66. The principles enunciated by the U.S. Supreme Court in *Hanover Shoe, Inc. v. United Shoe Machinery Corp.*, 392 U.S. 481 (1968) and *Illinois Brick Co. v. Illinois*, 431 U.S. 720 (1977), elevate Plaintiff and the proposed class to the preferred position of "private attorneys general" to assert Section 4 claims because they are the victims at the highest level in the chain of distribution with statutory standing under Section 4 to pursue such claims. If Plaintiff and the proposed class cannot bring a Section 4 damages claim for those overcharges, then no U.S. victim can do so, which would improperly eviscerate a legislatively conferred cause of action.

**C. Class Action Allegations**

67. Plaintiff brings this action on behalf of himself and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure seeking damages

pursuant to Section 4 of the Clayton Act on behalf of the following class (the "Nationwide Damages Class"):

> All persons and entities who, during the Class Period, directly purchased a Finished Fragrance Product that incorporated Fragrances from one or more Defendants in the United States (a) from a seller located outside the United States, or (b) from a seller in the United States that acquired the relevant product outside the United States from that seller's foreign affiliate, any current or former subsidiary of Defendants, or any co-conspirator of Defendants.

68. On information and belief, the proposed class includes thousands of members.

69. Common questions of law and fact exist as to all members of the Class. This is particularly true given the nature of Defendants' conspiracy, which was generally applicable to all members of the Class, thereby making appropriate relief with respect to the Class as a whole. Such questions of law and fact common to the Class include, but are not limited to:

a. Whether Defendants and their co-conspirators engaged in a combination and conspiracy among themselves to fix, raise, maintain, or stabilize the prices of Fragrances;

b. The identity of the participants of the alleged conspiracy;

c. The duration of the alleged conspiracy and the acts carried out by Defendants and their co-conspirators in furtherance of the conspiracy;

d. Whether the alleged conspiracy violated Sections 1 and 3 of the Sherman Act;

e. Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the class they seek to represent;

f. The effect of the alleged conspiracy on the prices of Finished Fragrance Products sold in the United States;

g. Whether Plaintiff had any reason to know or suspect the conspiracy, and means to discover the conspiracy;

h. Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff; and

i. The extent of the overcharges imposed by the conspiracy on Finished Fragrance Products.

70. Plaintiff's claims are typical of the claims of members of the proposed class, and Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff and all members of the proposed class are similarly affected by Defendants' wrongful conduct in that they paid artificially inflated prices for Finished Fragrance Products as direct, substantial, and reasonably foreseeable consequences of Defendants' conspiracy.

71. Plaintiff's claims arise out of the same common course of conduct giving rise to the claims of the other members of the Class. Plaintiff's interests coincide with, and not antagonistic to, those of the other members of the Class. Plaintiff is represented by counsel who are competent and experienced in the prosecution of antitrust and class action litigation.

72. The questions of law and fact common to members of the Class predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

73. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism substantially outweigh any difficulties that may arise in the management of this class action.

74. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

## VIII. PLAINTIFF'S CLAIMS ARE TIMELY

75. As alleged above, Plaintiff did not discover, nor could he have discovered through the exercise of reasonable diligence, the existence of the conspiracy before the public disclosure of regulatory actions. Indeed, regulators took such action to gather evidence that is unavailable in the public domain to confirm suspicions of unlawful collusion.

76. Defendants' conspiracy was inherently self-concealing because it depended on secrecy.

77. Defendants fraudulently concealed the existence of the conspiracy by resorting to pretextual explanations that carried a pretense of legitimacy for price increases, and by otherwise hiding evidence of their conduct. The actions of IFF's employees obstructing the EC investigation are evidence of such conduct.

## IX. CLAIM FOR RELIEF

**Violation of Sections 1 and 3 of the Sherman Act ( 15 U.S.C. §§ 1, 3)**

**(Conspiracy in Restraint of Trade)**

78. Plaintiff incorporates by reference the allegations in the paragraphs above.

79. From at least January 1, 2018, and continuing until the effects of their unlawful conduct ceased through the present, Defendants and their co-conspirators entered into, and engaged in, a combination, conspiracy, and/or agreement to unreasonably restrain trade in violation of Sections 1 and 3 of the Sherman Act. The alleged contract, combination, or conspiracy is a *per se* violation of the federal antitrust laws.

80. The contract, combination, or conspiracy consisted of an agreement among the Defendants and their co-conspirators to fix, raise, stabilize, or maintain

the prices they charged for Fragrances throughout the world, including in the United States.

81. The acts done by Defendants as part of, and in furtherance of, their unlawful conduct alleged above were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of their affairs.

82. As a result of Defendants' unlawful conduct, Plaintiff has been harmed in his business or property by being forced to pay inflated, supra-competitive prices for Finished Fragrance Products.

83. Plaintiff's injuries arise from the direct, substantial, and reasonably foreseeable effects of Defendants' conduct on U.S. commerce.

84. The alleged contract, combination, or conspiracy is a per se violation of the federal antitrust laws.

85. Plaintiff and the proposed class are the first victims in the chain of distribution with statutory standing to assert damage claims pursuant to Section 4 of the Clayton Act. Plaintiff and members of the asserted class are entitled to treble damages.

## REQUEST FOR RELIEF

86. Plaintiff, on behalf of itself and the Class of all others so similarly situated, respectfully requests the relief below.

87. First, that the Court determine that this action may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure, appoint the named Plaintiff as representative of the Class and the undersigned law firms as counsel to the proposed class, and direct that reasonable notice of this action, as provided by Rule 23(c)(2) of the Federal Rules of Civil Procedure, be given to each and every member of the Class.

88. Second, that judgment be entered for Plaintiff and the putative class against Defendants, jointly and severally, for treble damages, in an amount to be proven at trial, plus reasonable costs and expenses, including attorneys' fees.

89. Third, that the Court award Plaintiff and members of the Class such other and further relief as the Court may deem just and proper under the circumstances.

## X. JURY DEMAND

90. Plaintiff demands a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure.

DATED: January 27, 2026 **ZELLE LLP**

By: /s/Jonathan R. MacBride

Jonathan R. MacBride (Bar No. 31851995)
Meredith C. Schilling (Bar No. 00802010)
2929 Arch Street
Suite 1700, The Cira Centre
Philadelphia, PA 19104
Telephone: (484) 532-5341
jmacbride@zellelaw.com
mschilling@zellelaw.com

James Robertson Martin*
Jennifer Duncan Hackett*
Sabrina Nelson*
Desmond Sims*
Noah Wolfenstein*
1775 Pennsylvania Avenue, NW,
Suite 375
Washington, D.C. 20006
Telephone: (202) 899-4100
jmartin@zellelaw.com
jhackett@zellelaw.com
snelson@zellelaw.com
dsims@zellelaw.com
nwolfenstein@zellelaw.com

**ZIMMER, CITRON & CLARKE, LLP**

Eric Citron*
130 Bishop Allen Drive
Cambridge, MA 02139
Telephone: (202) 796-4540
eric@zimmercitronclarke.com

**Pro Hac Vice forthcoming*

***Attorneys for Plaintiff,***
***Brian Fields***